IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| **MARIE C. THOMAS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | **CIVIL ACTION** |
| ) | **NO. 3:21-CV-00020** |
| **ACTING ATTORNEY GENERAL,** ) | |
| **MONTY WILKINSON, SECRETARY** ) | |
| **DEPARTMENT OF JUSTICE,** ) | |
| ) | |
| **Defendant.** ) | |

## *COMPLAINT*

### *Introduction*

1. This is a complaint for damages, declaratory and injunctive relief authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e *et seq*. ("Title VII"), and pursuant to the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C § 791 *et seq*.

2. This lawsuit is brought to prevent Defendant, ACTING ATTORNEY GENERAL, MONTY WILKINSON, DEPARTMENT OF JUSTICE, pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, et seq. ("Title VII") and the Rehabilitation Act, from maintaining a policy, practice, custom or usage of discriminating against, Plaintiff, MARIE C. THOMAS, in regard to terms, conditions and privileges of employment, and for damages, and other equitable relief for Plaintiff, MARIE C. THOMAS, who has been discriminated against by Defendant on the basis of race/national origin (Hispanic), sex (female); disability, and reprisal (prior EEO Activity).

### *Jury Demand*

3. A jury is hereby demanded.

*Jurisdiction and Venue*

4.     This action is brought for a declaratory judgment, injunctive relief and compensatory damages, pursuant to 42 U.S.C. Section 1983, 20 U.S.C. Sections 1681-1688, 28 U.S.C. Sections 2201 and 2202.  This Court has jurisdiction to hear the Plaintiff's claims pursuant to 28 U.S.C. Sections 1331, 1343(3) and (4) 1337 and 42 U.S.C. 2000e-5(f) [Section 706(f)(s) and (3) and 704(a) of Title VII].

5.     Venue is proper in the Western District of Texas, El Paso Division pursuant to 28 U.S.C. Section 1391(b) as El Paso County, Texas is the county where the Defendant operates the Drug Enforcement Agency (DEA), Plaintiff's employer.  Further, all actions complained of herein occurred within the El Paso County, Texas.

*Parties*

6.     **MARIE C. THOMAS** is a Hispanic-female citizen of the United States and a resident of the City of El Paso, El Paso County, Texas.

7.     Plaintiff is employed by the Defendant, **ACTING ATTORNEY GENERAL, MONTY WILKINSON, DEPARTMENT OF JUSTICE**.  The Defendant maintains and administers records relevant to its employment practices.  Service of process may be made upon the United States Attorney for the Western District of Texas, and the United States Attorney General, Department of Justice, by registered or certified mail, pursuant to the Federal Rules of Civil Procedure (Rules 4(I)(1)(A), (B) & (C)).

8.     Defendant is an employer within the meaning of 42 U.S.C. 2000e, et seq., ("Title VII") and the Rehabilitation Act.

*Exhaustion of Remedies*

9. Plaintiff filed a formal complaint of discrimination. Such filing was within at least 45 days of the last act of which she complained. Plaintiff's formal complaint alleged denial of Plaintiff's rights, by Defendant, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., as amended by the Civil Rights Act of 1991, and the Rehabilitation Act. Specifically, MARIE C. THOMAS alleges that she was discriminated against because of her national origin (Hispanic), sex (female) and subject to retaliation (prior EEO Activity).

10. All conditions precedent to the filing of the lawsuit has been met.

*Factual Allegations*

11. Technical Information Specialist, Marie Thomas ("Plaintiff") held the position of Technical Information Specialist, GS-12, at the El Paso Intelligence Center ("EPIC"), located in EI Paso, Texas. She held this position for eight years and is employed with the Drug Enforcement Administration ("DEA") for over nine years.

12. Plaintiff is a female with a medical disability. She was diagnosed with Chronic Insomnia in 2000. Plaintiff has a serious medical condition that prevents her from falling asleep and/or staying asleep, and due to this she does not feel well rested. Her disability affects her physical health, cognitive thinking, concentration and focus, slows reactive response, lack of coordination, daytime fatigue, lethargy, etc. Plaintiff's disability is trigger by stress, irregular sleep schedules, and illness. Plaintiff had to be placed on a permanent shift to help reduce the episodes of insomnia. Plaintiff has to limit her activities such as driving, operating machinery, cooking, etc. Plaintiff has had to miss work and other events due to her sleep disorder.

13. Management was aware of her disability and had access to her personnel file, wherein her Request for Reasonable Accommodation, DOJ Form 100A, dated January 11, 2016 is stored. In

addition, both EEO Complaints in 2015 and in 2017 documents her disability. Furthermore, Plaintiff advised Acting Deputy Section Chief Michael J. Tinkler ("Mr. Tinkler") of her medical condition during the first meeting when he came in to introduce himself to the midnight shift. Plaintiff informed him that she could not work on rotating shifts, and due to the midnight shift being the only permanent, non-rotating shift, she had requested to transfer to this shift. Plaintiff was concerned that the new chain of command would make changes and require the night shift to rotate. Mr. Tinkler assured her there was no need to worry, that the night shift personnel would not rotate, and continue to be permanent and voluntary.

14. In June 2017, Technical Information Specialist ("TIS") Jacobo ("Jake") Ortiz ("Mr. Ortiz") a GS-12 who was Plaintiff's peer and was inequitably appointed as the Midnight Shift Watch Commander by Mr. Tinkler on November 25, 2016. As a Watch Commander ("WC"), Mr. Ortiz' duties consist of only overseeing the Watch's operations and was never Plaintiff's first line supervisor. Mr. Tinkler was Plaintiff's first line supervisor.

15. Mr. Tinkler was fully aware of Mr. Ortiz dislike for Plaintiff and Sylvia Marquez ("Ms. Marquez") and had knowledge of Mr. Ortiz' harassment of Plaintiff and her EEO Complaint in 2015.

16. Mr. Tinkler did not announce that there would be an opening for WC on the Midnight Shift, nor that he would be appointing anyone as the WC, prior to his email dated November 25, 2016, wherein he appoints Mr. Ortiz to this position. Mr. Tinkler bypassed Plaintiff and Ms. Marquez, who were the only other two TIS on the Midnight Shift. Both Plaintiff and Ms. Marquez had more seniority than Mr. Ortiz, and all had been acting and sharing the duties of WC on the Midnight Shift. There were other TIS on the other two shifts who also had more seniority than Mr. Ortiz, and who would have been interested in the position of WC, which historically had been a GS-14 position.

17. Plaintiff filed a prior EEO complaint in 2015, and Mr. Tinkler was aware of her prior EEO

activity because he made statements to the Plaintiff about her having an issue serving in acting capacity as WC without compensation. This would have been only privy to Unit Chief and then Acting Deputy Section Chief John H. Block, Plaintiff's previous chain of command. Plaintiff also filed an official grievance, routing number DSN 020-04, through the chain of command regarding this complaint but did not receive a response, prior to filing the EEO Complaint in 2017.

18. Plaintiff was assigned to work permanent nights while working in the Watch and believes this was a result of having filed the prior EEO complaint.

19. Mr. Tinkler sent two emails dated January 12, 2017, and April 19, 2017, for the purpose of providing examples of what content was required in Law Enforcement Inquiry and Alerts ("LEIA"). There was no policy listing approved only abbreviations or notations. Mr. Ortiz never contacted Plaintiff prior to speaking to Mr. Tinkler about the notation. Mr. Ortiz spoke to Ms. Landers first, and they addressed the matter with Mr. Tinkler prior to notifying Plaintiff of the notation error.

20. Mr. Tinkler asked to meet with Plaintiff on June 30, 2017, in the presence of Unit Chief Mary Campbell ("Ms. Campbell") who is not in Plaintiff's chain of command. Plaintiff received no prior notice of the meeting and received no explanation as to why Ms. Campbell was present.

21. At this meeting Mr. Tinkler pointed to a folder that he placed on top of the table that was between him and Mrs. Campbell and stated he had a bunch of documentation that would prove Plaintiff had issues with the QC Team. Mr. Tinkler had no knowledge of any other LEIAs until Plaintiff informed him during the meeting that Plaintiff use personal notations on several of her LEIAs. Mr. Tinkler has indirectly revealed his tactic style **"good cop/bad cop"**, treated Plaintiff like a criminal throughout this very hostile meeting, and Mrs. Campbell encouraged it by taking part in it. In addition, Mr. Tinkler knew of Plaintiff's 2015 EEO complaint, and the concerns Plaintiff had with both Ms. Landers and Mr. Ortiz being entrusted with positions of power.

22.     Ms. Campbell did not sit in this meeting as an unbiased witness, she was a very vocal participant and also threatened the Plaintiff.  Ms. Campbell is an African American female who had recently served as a member on Plaintiff's Intelligence Research Specialist (IRS) hiring board.  Ms. Campbell also interviewed two other African American females who were also competing for the same IRS position as Plaintiff.  Mr. Tinkler had Ms. Campbell at the meeting because Plaintiff was a female and he wanted to have another female and supervisor present just to avoid any problems later as such was the case with Plaintiff who would have made any allegation of anything Mr. Tinkler may or may not have said.  This is after the fact that Mr. Tinkler met with Plaintiff in their first meeting and there have been a few other meetings that Plaintiff had with Mr. Tinkler without another supervisor present.

23.     Mr. Tinkler and Acting Section Chief A.C. Rico Tanner (Mr. Tanner) never afforded Plaintiff the courtesy and have denied Plaintiff's request from having a witness of her peers present to protect her interest and of any false allegations.  They have both denied Plaintiff's request for Mario Meraz to serve as her witness at the Mandatory Management Meeting, August 17, 2017.  Mr. Tinkler was again visibly angered, he stated this aloud and in the open where other Watch Officers (WO) heard, as documented in Plaintiff's amendment to EEO Complaint, August 17, 2017.

24.     There has been precedence set by prior supervisors, and even by Mr. Tinkler himself to send out emails advising the affected employee of a meeting in order to make arrangements and ensure the employee will be able to attend the meeting.  Furthermore, there is no DEA policy stating a supervisor cannot provide an employee with prior notice or allow them to have a witness if they so desire.  This is known as common courtesy and best practice.  Even Plaintiff's EEO Representative, Carla Ramirez, didn't understand why management was so adamantly against Plaintiff's request to have a witness present.

25. Mr. Tinkler states that he always has another supervisor with him in his meetings, normally of his choosing, and not a neutral party. Is his intent solely to have a witness present, or is it to have a willing participant to take part in the "**good cop/bad cop**" modus operandi.  This is a very convenient and one-sided practice that only ensures the protection of what is said by supervisors, i.e. Unit Chief Mary Campbell, Acting Deputy Section Chief Michael J. Tinkler and Acting Section Chief Alfred "Rico" Tanner.

26. Mr. Tinkler accused Plaintiff of writing a derogatory remark on a LEIA. Plaintiff was aware of the LEIA Mr. Tinkler was referring to, because Mr. Ortiz had questioned her a few weeks earlier and stated, "THEY want to know what this meant?"  He had also suggested that Plaintiff correct her LEIA.

27. Plaintiff had written "FUQC" on a LEIA as a personal note to "follow-up" with the many emails regarding Quality Control but forget to do so. Mr. Tinkler perceived that she was ~~telling~~ directing a derogatory remark to the Quality Control Team ("QCT").

28. It is normal for WO, especially those who have law enforcement backgrounds to make notations on LEIA packets, for example 'NFI" is also a common notation used by WO to indicate there is "No Further Information", among many other abbreviations/notations.

29. As documented in one of Plaintiff's email dated March 14, 2017, subject General Watch Office Concerns and forwarded to Inspector Kevin Hatchett, "It's a shame that none of our immediate Chain of Command know what we do, and are not familiar with the databases, nor the intricacies of these database that we are required to use on a daily basis as Watch Officers.  This is the very reason why supervisory duties are now commonly and continuously delegated to the Watch Officers".  The majority of the Watch's traffic are telephone calls from vetted Law Enforcement Officers, who are normally on a traffic stop, or involved with some other **time critical** type of

enforcement.

30. Plaintiff during time critical telephone calls used many abbreviations to include "FU" for "Follow Up", which is a very common abbreviation in the law enforcement and medical community. However, Mr. Tinkler exploited this incident to retaliate against Plaintiff for her complaints made to Kevin D. Hatchett with Office of Inspections on or about May 16, 2017 regarding Mr. Tinkler. Mr. Tinkler made several threatening statements to Plaintiff during the meeting of June 30, 2017. He threatened to transfer her to the day shift. He threatened her that she would be trained by Ms. Landers, who had participated in the harassment of Plaintiff and was documented in her previous EEO. He threatened her several times with submitting her to a polygraph. He also stated her error in judgement could cost her the promotion to the IRS position she had just applied for, and that her current position as a TIS was in serious jeopardy.

31. Mr. Tinkler threatened to place Plaintiff on the day shift to be train by WO Valerie Landers during the meeting on **June 30, 2017**, and then made good on his threat by email on **August 01, 2017**.

32. Mr. Tinkler and Ms. Campbell both stated that they could not see Plaintiff in the position of an IRS, and stated on several occasions, "DEA is a very small agency and everyone will know of you!" Plaintiff reiterated that the notation was not a derogatory remark, and she did not appreciate his threats. (The abbreviation for follow up (FU) is widely used in the law enforcement and medical community, and Plaintiff can provide examples e.g., a doctor's appointment card with "FU Appt" written for her follow up appointment information, and another WO's LEIA containing the "FU" abbreviation).

33. The email dated June 27, 2017, by Mr. Ortiz documents this interaction as it states, "they want know what this is," which gives the impression that Chain of Command was already aware of

the abbreviation written on the LEIA. Also, in Mr. Tinkler's Affidavit dated January 23, 2018, his response to Question 47. How and when did you become aware of the notation? "One of the WCs brought it to my attention who is also working the midnight shift, Mr Jacobo..." Last but not Least, in the EEO Counselor's Report, page 4., "Mr. Tinkler stated that Ms. Thomas has utilized unapproved acronyms in the past. **On this occasion, Mr. Jacobo Ortiz/Watch Commander brought the use of inappropriate acronym to his attention** which resulted in the meeting with Ms. Thomas on June 30, 2017."

34. Mr. Tinkler's response that it is not normal for employees to make notations on LEIA packets is contradictory. The abbreviations and notations are used on reports to speed up the process and provide callers with pertinent information in a timely manner. The LEIA packets are editable for up to fourteen days and has a private side for WO to write personal notes and a public side for officers to view. Other WO may have also forgotten to remove personal notations from a LEIA.

35. Mr. Tinkler sent Plaintiff an email on August 12, 2017, informing her that she would be placed on a two-week rotation to the day shift for training. That the email was sent to Plaintiff's Ms. Marquez, and Contractor Juventino Gutierrez ("Mr. Gutierrez") but did not include all the midnight shift employees. WC Mr. Ortiz and Contractor Leticia Arias ("Ms. Arias") or Contractor Eunice Reyes ("Ms. Reyes"). Ms. Reyes did not receive this email because she was placed on the day shift at her request due to a family matter rather than for training.

36. Plaintiff strongly believes Mr. Tinker was following through with his threats to transfer her to the day shift under the pretense of training with Ms. Landers, as he had stated during the meeting of June 30, 2017. Ms. Lander's has no background or any certifications as a trainer and has less seniority and less experience than the Plaintiff. In addition, Mr. Tinkler was fully aware of Plaintiff's disability and how negatively this would impact her health. Over and above, Mr. Tinkler

was very much aware of Ms. Lander's disdain and harassment of the Plaintiff, which Plaintiff's EEO Complaint in 2015 documents Mr. Lander's actions.

37. On August 17, 2017 Plaintiff was summon to a meeting with Mr. Tanner and Mr. Tinkler. Mr. Tanner and Mr. Tinkler denied Plaintiff from having an unbiased witness of her peers, TIS Mario Meraz ("Mr. Meraz"), had arranged to be present during this meeting. Mr. Tinkler again lost his temper and yelled at the Plaintiff when she advised him that she would not attend the meeting without a witness present for her own protection. Mr. Meraz, TIS Alice Sanchez, and Contractor Ana Solis were all in near proximity of where Plaintiff was sitting, and they all witnessed to Mr. Tinkler's temper tantrum. Plaintiff reluctantly attended the meeting with both Mr. Tanner and Mr. Tinkler in Mr. Tanner's office, and she requested for the door to remain open, and advised them both if she became uncomfortable with any of their actions or comments she would leave. Mr. Tanner handed the Memorandum of Warning and advised the Plaintiff that this would stay in her personnel file for a twelve-month period, and then it would be removed with the condition that Plaintiff would not have any other infractions during a twelve-month period.

38. Plaintiff was initially unaware there was a difference between a Memorandum and a Letter of Warning. The Memorandum of Warning made mention of standard abbreviations, but Plaintiff was not aware of a policy listing approved only abbreviations or notations. Plaintiff believes the Memorandum of Warning was placed in her personnel file for a twelve-month period with a condition that if there were no further incidents, it would be open for discussion to remove it.

39. Plaintiff's chain of command ~~has~~ created a hostile work environment causing her a great deal anxiety, stress, depression, physical illness and pain which worsened her insomnia and greatly impacted her health and disability. Plaintiff was experiencing a lot of stress, which made her physically ill and was not sleeping well at the time she wrote the abbreviation for "follow up" on the

LEIA in question. Mr. Tinkler exploited this incident and used it to his advantage his knowledge of Plaintiff's issues documented in her EEO Complaint in 2015, to include serving in the capacity as Acting WC without appropriate compensation. Furthermore, Mr. Tinkler as Plaintiff's first line supervisor had access to her personnel file, which would have included her Request for Reasonable Accommodation, DOJ Form 100A, dated 01/11/2016.

40. There is evidence of disparity and inequity in the treatment of the Plaintiff as opposed to her co-workers. There are employees who commit infractions, errors, mistakes, etc., and receive no punishment and are not reprimanded or admonished by chain of command. As case in point, Mr. Ortiz approved and closed out the Plaintiff's LEIA, and did not bring to her attention the abbreviation she had wrote on the Private Side of her LEIA. Mr. Ortiz failed to review the Midnight Shifts completed work for errors or missing information. He failed to reject and return the incomplete or incorrect work to the originating WO for corrections.

41. Most importantly, he did not even question the abbreviation written on the Private Side of Plaintiff's LEIA, which Mr. Tinkler deemed as an unacceptable and an egregious abbreviation and used this as his justification to severely reprimand and admonish Ms. Thomas. Despite Mr. Ortiz, who failed to perform his WC's duties by his own actions or lack thereof, which is a more serious infraction than what the Plaintiff has been accused of, Mr. Ortiz was not reprimanded and/or admonished for his mistakes and incompetence.

42. Mr. Ortiz as the WC has the responsibility of checking the night shifts WO's LEIAs prior to approving them. He failed to bring Plaintiff's LEIA and provide her with the opportunity to correct, instead he consulted with Ms. Landers, and then took it to Mr. Tinkler. Mr. Ortiz and Ms. Landers actions reinforced Plaintiff's fears as documented in my EEO Complaint (FY 2015) and this EEO complaint, July 29, 2017, "I personally fear that my Chain of Command is maliciously using any

information or documentation to justify lowering my Performance Appraisal Ratings, as they did on my FY 2015 Performance Appraisal. I also fear that my Chain of Command's motives are to lower my ratings on my Performance Appraisal to the point that they can justify and have cause for terminating my employment."

43. Another example of disparity and inequity in the treatment of the Plaintiff, On July 07, 2017 Ms. Marquez informed the Plaintiff that she had received an email from Mr. Tinkler advising her of a meeting early that morning. This courtesy was never afforded to the Plaintiff and due to these constant surprise meetings, she had to cancel pending appointments she had scheduled for after her shift had ended at 8am in the morning.

44. Last but not least, in Mr. Tinkler's affidavit dated January 23, 2018, his response to question number 47, "Has anyone else made similar notations on LEIA Packets?" "No Ma'am". However, Mr. Tinkler would not know if the abbreviation for follow up (FU) used on other employees LEIA, he does not review any of his employees completed work, nor knows what is going on in the Watch. Mr. Tinkler would only know if Ms. Landers or Mr. Otriz bring to his attention and make him aware of possible issues in the Watch. Significantly, Plaintiff has obtained a copy of Ms. Marquez LEIA dated 11/08/2018, wherein WC Socorro Medina (TIS) wrote the abbreviation "F/U In-Correct Spelling". Therefore, there is a great possibility of other WO's LEIAs may contain this abbreviation. As previously stated, the abbreviation for follow up (FU) is widely used in the law enforcement and medical community.

45. Plaintiff was discriminated based on her race (Hispanic), sex (female), disability (insomnia), and prior EEO activity. Plaintiff filed an EEO complaint in 2015 and suffered an adverse action when Plaintiff's supervisor informed Plaintiff on August 1, 2017, that she would be placed on a two-week rotation to the day shift for training. Plaintiff's supervisor met with her on June 30, 2017, in

the presence of another employee regarding a notation Plaintiff made on a LEIA document and threatened Plaintiff, when Mr. Tinkler was aware of Plaintiff's 2015 EEO complaint. Plaintiff was treated differently than her co-workers as there are employees who make mistakes without being reprimanded.

## COUNT ONE
### TITLE VII VIOLATION - SEX (GENDER)

46. The Plaintiff realleges paragraphs 1 - 45 as if fully set forth herein.

47. Defendant discriminated against Plaintiff herein since the agents and employees of Defendant engaged in discrimination based on sex in violation of Title VII of the Civil Rights Act. Specifically, the Plaintiff suffered adverse employment consequences as a direct result of sex (female). As a direct and proximate result of these actions, Plaintiff suffered sex discrimination.

48. By reason of the Defendant's actions, the Plaintiff found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorneys fees pursuant to Title VII and under the general equity Powers of the Court.

## COUNT TWO
### TITLE VII VIOLATION – RACE/NATIONAL ORIGIN (HISPANIC)

49. The Plaintiff re alleges paragraphs 1 - 48 as if fully set forth herein.

50. Defendant discriminated against Plaintiff herein since the agents and employees of Defendant engaged in discrimination based on Race/National Origin in violation of Title VII of the Civil Rights Act. Specifically, the Plaintiff suffered adverse employment consequences as a direct result of Race/National Origin (Hispanic). As a direct and proximate result of these actions, Plaintiff suffered Race/National Origin (Hispanic) discrimination harassment.

51. By reason of the Defendant's actions, the Plaintiff found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorneys' fees pursuant to

Title VII and under the general equity Powers of the Court.

## COUNT THREE
## DISABILITY DISCRIMINATION

52.     Plaintiff realleges paragraphs 1 - 51 as if fully set forth herein.

53.     The actions of Defendant constituted disability discrimination against Plaintiff in the creation and condonation of a disability bias and a hostile work atmosphere which changed the terms and conditions of her employment.

54.     The unlawful employment practices in violation of the Rehabilitation Act herein complained of occurred in the course of Plaintiff's employment with Defendant were carried on by Defendant's agents, servants, and employees and committed because of Plaintiff's disability.

55.     Defendant discriminated against Plaintiff herein because of her disability with respect to the terms, conditions, privileges, advantages and benefits of her employment with Defendant. Specifically, Plaintiff was harassed, held to stricter standards of performance, and denied benefits of employment accorded other employees.  Furthermore, Plaintiff was denied a reasonable accommodation request.

56.     In addition, Plaintiff was treated dissimilarly from other employees.

57.     By reason of the Defendant's actions, the Plaintiff found it necessary to retain the services of an attorney in these proceedings heretofore and is therefore entitled to attorney's fees pursuant to the Rehabilitation Act and under the General Equity Powers of the Court.

58.     By reason of the Defendant's actions, Plaintiff, **MARIE C. THOMAS** found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorney's fees pursuant to the Rehabilitation Act, and under the general equity Powers of the Court.

## COUNT FOUR
## REPRISAL/RETALIATION

59. The Plaintiff, **MARIE C. THOMAS** realleges paragraphs 1 - 58 as if fully set forth herein.

60. Defendant retaliated against Plaintiff, **MARIE C. THOMAS** herein since it engaged in reprisal and retaliation in violation of the Title VII. Specifically, Plaintiff, **MARIE C. THOMAS** suffered adverse employment consequences as a direct result of her participation or assistance in an EEOC process. As a direct and proximate result of these actions, Plaintiff, **MARIE C. THOMAS** suffered retaliation and reprisal.

61. By reason of the Defendant's actions, Plaintiff, **MARIE C. THOMAS** found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorney's fees pursuant to Title VII, and under the general equity Powers of the Court.

WHEREFORE, Plaintiff respectfully requests:

a. A declaratory judgment, declaring Defendant's acts, through the acts of its agents, employees and successors, herein complained of to be in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and/or the Rehabilitation Act.

b. Compensatory damages against the Defendant for each violation of Plaintiff's rights, as protected by Title VII and/or the Rehabilitation Act, for her pain, suffering, emotional distress, humiliation and for any resulting physical and emotional damages, in the amount of $300,000.00;

c. Attorney's fees, court costs, prejudgment and post judgment interest as provided by law including Title VII; and

d. Such other and further relief to which Plaintiff may be entitled.

Respectfully submitted,

*The Law Office of Enrique Lopez*
701 N. St. Vrain Street
El Paso, Texas 79902
Telephone: (915) 351-0595
Facsimile: (915) 534-7207

By: /s/ Enrique Lopez
    ENRIQUE LOPEZ
    State Bar No.: 12563530

Attorney for Plaintiff